IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **BRYAN BECKSTRAND,** | ) | **CV F 05-0323 AWI LJO** |
| | ) | |
| **Plaintiff,** | ) | **ORDER REGARDING MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| **v.** | ) | **ON STANDARD OF REVIEW** |
| | ) | |
| **ELECTRONIC ARTS GROUP LONG** | ) | (Document #13) |
| **TERM DISABILITY INSURANCE** | ) | |
| **PLAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PROCEDURAL HISTORY**

On March 7, 2005, Plaintiff filed a complaint for declaratory relief.   Plaintiff's complaint arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1) & (3), as amended, ("ERISA").   The complaint alleges that Plaintiff has been diagnosed as suffering from HIV/AIDS and the complications associated with this disease.   The complaint alleges that Plaintiff is totally disabled under the terms of Defendant's long term disability plan. The complaint alleges that on September 8, 2004, Defendant terminated benefits to Plaintiff stating that the medical information it had did not continue to support impairment from a less than sedentary occupation.   Plaintiff requests a judicial determination of his rights and a declaration finding that Defendant is obligated to pay long-term disability benefits.

On August 5, 2005, Plaintiff filed a motion for partial summary judgment regarding the

standard of review.   Plaintiff requests a finding by the court that the court's review of this action will be de novo.

On August 26, 2005, Defendant filed an opposition.   Defendant contends the appropriate standard of review is abuse of discretion.

On September 2, 2005, Plaintiff filed a reply.

## UNDISPUTED FACTS[1]

### A.  ADMINISTRATIVE PROCEEDINGS

Beckstrand was an employee of Electronic Arts, Inc.   Beckstrand was a participant in the Electronic Arts, Inc. Insurance plan ("the Plan").

Beckstrand stopped working on June 2, 1998.

Benefits under the Plan are subject to reduction for receipt of "other benefits."   Other Income Benefits include "disability or retirement benefits under the United States Social Security Act."   The Social Security Administration found Beckstrand disabled under its rules effective June 2, 1998, and entitled to Social Security Disability Benefits.   The Plan reduced its payments to Beckstrand by $1,136 per month due to his receipt of SSDI benefits.

By letter dated January 15, 1999, Defendant initially (first denial) denied Long Term Disability benefits to Plaintiff, stating:

> Unfortunately, we find no evidence throughout the chart notes, of your having been treated or formally tested for cognitive dysfunction and fatigue. Furthermore, your chart notes contain no reference or objective findings to support your inability to perform the material duties of your regular occupation as of your last date worked and throughout the elimination period, due to cognitive dysfunction and fatigue. As such, your claim must be denied.

The January 15, 1999 correspondence also discussed in detail the medical records from Dr. Razzeca and Dr. Duwe.

---

[1]  Defendant objects to some of Plaintiff's proposed undisputed facts on the ground that Plaintiff cites the wrong page of the administrative record.   Defendant does not state that the records do not exist.   Because consideration of this evidence does not change the result in this action, the court will consider this evidence.

By letter dated March 9, 1999, Beckstrand appealed the first denial. That appeal stated, in part:

> Mr. Beckstrand deals with AIDS related symptoms and complications on a daily basis, the most severe of which are chronic fatigue, dizziness, weakness, memory and concentration problems, shortness of breath, and persistent diarrhea and nausea.  In short, Mr. Beckstrand's AIDS-related symptoms and complications severely limit his daily functioning and render him unable to perform the material duties of his regular occupation.

By letter dated July 21, 1999, the Plan reversed its first denial of Beckstrand's claim, stating, in part: "We have conducted an independent review of your claim file and the additional information submitted in accordance with the Employee Retirement Income Security Act of 1974.  We have determined that our original determination should be reversed."

By letter dated August 24, 2000, the Plan notified Beckstrand it was conducting a review under the "any occupation" definition.

On or about September 21, 2000, the Plan terminated Beckstrand's benefits (second denial).

By letter dated September 28, 2000, Beckstrand appealed the second denial of his benefits stating:

> In addition to these lab results, I continue to experience many other symptoms and problems associated with HIV infection and the severe side effects of the medication I must take to remain healthy. The most severe of these include: severe chronic fatigue, confusion, dizziness, cognitive dysfunction, insomnia, severe diarrhea, chronic headaches, depression, inability to concentrate, forgetfulness, lack of appetite and nausea.   I currently require between 10-13 hours of sleep per day to feel somewhat rested and even then I can barely keep my residence in a condition that approaches clean. In a review of 91 continuous days marked on my calendar, I felt 'good' on only 11 of those days. The other 80 were marked by variations of the abovementioned problems. I find the simple task of reading difficult due to the inability to concentrate.

By letter dated January 21, 2001, the Plan reversed its second denial and reinstated benefits, stating: "We have conducted an independent review of your claim file and the additional information submitted in accordance with the Employee Retirement Income Security Act of 1974. We have determined that our original determination should be reversed."    By

letter dated June 5, 2001, the Plan notified Beckstrand that he remained totally disabled under the terms of the policy, stating, in part:

> We have completed our investigation to determine your continued eligibility for Long Term Disability benefit. Based on the latest medical information received from Camino Medical Group, you are totally disabled from performing any occupation as defined in the group policy provision stated above. As a result, benefits will continue to June 3, 2032 or until you no longer meet the provisions of your policy, whichever comes first.

By letter dated November 19, 2003, the Plan again terminated benefits (third denial), stating, in part:

> Our letter dated July 24, 2003, informed you this information must be received no later than August 22, 2003. To date, we have yet to receive this required information in our office. Therefore, we have no alternative but to deny your claim at this time for failure to supply required information.

By office memo dated January 6, 2004, Beckstrand's benefits were reinstated, stating, in part:

> EE off work since 6/3/98. Primary symptoms appear to be fatigue and GI upset, possible side effects of medications. CD4 and viral load are within normal limits. There does not appear to be any change in the employee's medical condition since the previous medical review however the medical records are very limited. I would recommend obtaining an IME for more detailed findings regarding EE's current medical condition. Based on information reviewed it would appear the medical would continue to support restrictions and limitations of less than sedentary work through completion of the IME.

By letters dated September 2 and September 8, 2004 (same letter), the Plan terminated Beckstrand's benefits (fourth denial) again. The stated reasons were:

> * Viral load undetectable and CD4 count of greater than 600;

> * Medical information does not support impairment.

In addition, the letter also stated that the medical records did not show that Beckstrand was under the regular care of a physician, records from Dr. Lutz showed that the CD4 and viral load were within normal limits, and that an independent medical evaluation confirmed these findings.

By letter dated September 14, 2004, Beckstrand appealed the fourth denial of his benefits,

stating, in part:

> I continue to experience many symptoms and problems associated with HIV
> infection and the severe side effects of the medication I must take to remain
> healthy. The most severe of these side effects include: severe chronic fatigue,
> confusion, dizziness, cognitive dysfunction, insomnia, diarrhea, chronic
> headaches, depression, inability to concentrate, forgetfulness, lack of appetite,
> and nausea. I need between 10-13 hours of sleep per day to feel even somewhat
> rested and even then I can barely keep my residence in a condition that
> approached clean; I frequently need assistance in cleaning and preparing meals. I
> find the simple tasks of reading as well as writing difficult due to the inability to
> concentrate.

By letter dated December 15, 2004, the Plan upheld the denial of benefits and notified
Beckstrand that he had exhausted his administrative remedies. The reasons stated were:

* Physical complaints suggest somatization;

* Beckstrand **might** suffer from depression and is not seeing a psychiatrist for it;

* Medical information does not support continued disability

**B. BECKSTRAND'S MEDICAL EVIDENCE**

2/8/00 (Razzeca) Doctor's Statement: "Skin rashes, diarrhea, fatigue, severe cramping,
chronic headaches, oral thrush, esophageal candida, headaches, inability to concentrate.
Amprenevir 1200 bid, Efavirenz 600 q hs, 3TC 150 bid, d4t 40 bid, Prilosec 20 q d, Acyclovir
400 bid, Clotumazole prn, Bactrin 3 x week." Return to work "Never."   Return to gainful
occupation "Never."  "Patient showing impairment in cognitive functioning. Multiple side effects
from medication, chronic fatigue."

2/8/00 (Camino Medical Group): "C/o increased fatigue, nightsweats x 2, c/o depression
on antidepressants. Difficulty tolerating medications–persistent diarrhea and cramping–will try
Ultrase. Continue Imodium. Skin rashes with intense [illegible].   Recent episode oral candida.
Increased reflux–improving with Prilosec. . . . Fatigue–major problem–intensified by depression.
Wt increased 3 lbs. Afebrile. . . .VL slightly increased."

4/14/00 (Camino Medical Group): "Increased fatigue, occ night sweats. Increased
insomnia/depression. Trying to socialize more–encourage this. Wt increased 4 lbs (but started

back to gym). Afebrile."

4/13/00 (Camino Medical Group): "Fatigue is still major problem. Requires 2-2 ½ hour nap every afternoon. Never feels rested. Minimal exertion causes fatigue; persistent diarrhea. Slow wt training/cardio progress. Wt decreased 2.5, afebrile."

4/20/00 (Rezzeca) LTD Form: "Pneumocystic Carinii pneumonia. Karnofsky Performance Status Scale: 70 unable to work.  Able to live at home, care for most personal needs. A varying degree of assistance is needed. Cares for self. Unable to carry on normal activity or to do active work. Requires occasional assistance but is able to care for most personal needs. Requires considerable assistance and frequent medical care. Pt. on complex medication regimen. [Amprenivir 1200 bid, Efavirenz 600 q hs, 3TC 150 bid, d4t 40 bid, Prilosec 20 qd, Acyclovir 400 bid, Clotumezole, Bactr 3 x/week.] Precise timing critical to efficacy. Medication causes significant side effects nausea diarrhea and pain, fatigue. Able to care for self but cannot work due to medication regimen and side effects. Needs to avoid stressful activities. . . .frequent infections [illegible] to HIV infection.  Disability at this time will reevaluate in 6-12 months."

5/11/00 (Camino Medical Group):  "C/o fatigue, constipation, diarrhea. Continues to have problems with PI.  Constipated followed by diarrhea/bloat, chronic nausea, wt down 2 ½ lbs, afebrile."

8/21/00 (Camino Medical Group): "C/o diarrhea 3-4 x's day. Using Immodium. C/o difficulty concentrating poor short term memory and concentration. . . . Takes meds religiously. C/o 3-4 loose bm daily. [Illegible] and difficulty concentrating. Increased fatigue, insomnia. Still feels unable to take job."

9/11/00: (Camino Medical Group): "Headache–stress>cluster, sinus**,** hay fever, fatigue, increased cholesterol, decreased concentration, diarrhea."

3/2/01 (Razzeca) Doctor's Statement: "Fatigue, skin rashes, cramps, chronic headaches, reflux, anal thrush, difficulty concentrating, rashes." "Never" return to ususal work. "Never" return to gainful occupation.

10/8/01 (Lutz): "For about 2 weeks was without drugs. 6 weeks before test.  Fatigue has worsened since he has been off the antivirals. Diarrhea secondary to the antivirals. Nausea last p.m. . . .Viral load 430/but had been off anitvirals.) SGOT, SGPT elevated. Elevated VL secondary to poor compliance. Elevated LFTs secondary to meds vs. fatty liver vs. medication side effects."

11/8/01 (Lutz): "C/o 2 weeks congestion, rhinorrhea, productive cough. No fever. Prior history of pneumonia. Had [illegible] chest discomfort intermittent provoked or continuing. Not dyspenic. No exposure to ill persons. Night sweats Monday and Tuesday. Complains of bifrontal headaches. C/o Otalgia right ear 7 to 10 days ago. Recurred now like pressure, discomfort."

12/3/01 (Lutz): "Still with chronic fatigue. . . . diarrhea several times daily. Severe hyperlipidemia perhaps due in part to PI therapy?"

2/25/02 (Lutz Physician Statement): "Persistent fatigue–chronic diarrhea. . . . Improved over current but not full. . . . Maximum medical improvement expected in 12-18 months."

3/4/02 (Lutz): "Acute sore throat yesterday temp to 100 range. Denies new sexual partners. . . . fatigue and  insomnia could he have sleep apnea? Pulmo. Consult for sleep study."

5/29/02 (Lutz): "Headaches. He has allergies. Also c/o nasal congestion. Nasal secretions is on privulent. Left knee injured 5 or 6 weeks ago when dog tripped him. Has ongoing pain. . . . Also c/o suspected venereal warts. . . .Pharynx is injected. Has enlarged tonsils with patchy exudate."

9/9/02 (Lutz): "fatigue, diarrhea, headaches, [illegible], insomnia. Usually trouble falling asleep. A few times has trouble with repeated awakenings. Light snorer."

11/10/02 (Lutz): "Chronic fatigue, dizzy spell, unusual stool color. . . . No great change yet."

3/3/03 (Lutz) Office note: "Now on Pravachol 80 mg./day. Still with much fatigue. . . . diarrhea 5/d, takes loperamide two once daily. . . . paresthesis, numbness, low back pain, legs. . . . stable but chronic fatigue and chronic diarrhea preclude gainful occupation at this time."

1    3/4/03 (Lutz): "Fever to 101.2. Onset yesterday. Sweats, headache. No sore throat slight

2    nonproductive cough. . . . Probably viral URI. Influenza not excluded."

3    7/16/03 (Lutz): "C/o increased fatigue."

4    11/20/03 (Lutz) Office note: "Feels about the same. C/o fatigue, diarrhea. Has 1 to 5

5    stools, usually loosely formed but sometimes extremely watery. Some crampy abdominal

6    discomfort. . . . lipids too high."

7    2/23/04 (Lutz) Office note: "went to urgent care. Had respiratory tract infection. . .

8    . fever 101.9. . . .subsequent sharp chest pain, present several months 2 or 3x/week. . . .

9    nausea."

10    9/24/04 (Lutz) Office note: "tries to exercise e.g., weight lifting, bicycling. However,

11    often too fatigued to do so. . . . Fatigue, diarrhea, 3or 4 a day, headaches, Beckstrand takes

12    Epivir, Zerit, and Sustiva, Celexa, and Pravachol.

## C. THE PLAN'S MEDICAL EVALUATIONS

14    The Plan had Dr. William Hortsman complete a file review on Beckstrand. He reviewed

15    Beckstrand's records from April 1998 through September 2000. Dr. Hortsman's January 11,

16    2001 assessment stated:

> It is my opinion within a reasonable degree of medical certainty that the medical
> records through September 11, 2000 continue to support impairment with
> resultant less than sedentary restrictions and limitations. While the CD4 level is an
> easy objective parameter to follow, the patient level of symptoms does not always
> correlate with the CD4 level. This of course is true if the very drugs that are
> increasing the CD4 level are also responsible for the disabling complaints. The
> medical records document consistent complaints of fatigue, insomnia, decreased
> concentration, diarrhea and depression. These complaints are consistent with both
> the underlying HIV infection and even more so with the medication regimen. The
> protease inhibitors which this patient is on have numerous side effects including
> gastrointestinal upset, rash, depression, drowsiness, dizziness, insomnia, impaired
> concentration, abnormal dreams, confusion, fever, cough and shortness of breath.
> Mr. Beckstrand's complaints are consistent with his medication regimen. The
> medical records consistently document these complaints. It is my opinion that
> these complaints, particularly the fatigue and decreased concentration, impair the
> patient resulting in less than sedentary restrictions and limitations.

A January 6, 2004 e-mail from the Plan's Heather McCulloch to the Plan's Martha

8

McCullough stated, in part:

> EE off work since 6/3/98. Primary symptoms appear to be fatigue and GI upset, possible side effects of medications. CD4 and viral load are within normal limits. There does not appear to be any change in the employee's medical condition since the previous medical review however the medical records are very limited. I would recommend obtaining an IME for more detailed findings regarding EE's current medical condition. Based on information reviewed it would appear the medical would continue to support restrictions and limitations of less than sedentary work through completion of the IME.

The Plan hired Dr. Manthani P. Reddy, M.D., to conduct an independent medical evaluation ("IME") on Beckstrand. He opined:

> The patient is a middle-aged young male who is HIV positive with episodes of shortness breath. The patient underwent a complete two-dimensional echocardiogram with a Doppler study. This revealed a normal LV function without any pericardial effusion. His oxygen saturation was fine. I suspect his episodes of shortness of breath and fatigue are probably secondary to anxiety and/or depression rather than any structural abnormalities of his heart or his pulmonary system. I suggest the patient be seen probably by a psychiatrist for optimal regimen of anxiety and depression. From an HIV prospective, his viral load is undetectable, and his CD4 count is greater than 600 and appears to be on a fairly good regimen of highly antiretroviral therapy. I did have the opportunity of reviewing all the extensive records that were sent to me.

On December 8, 2004, Dr. Daniel Berman performed a file review of material that the Plan sent him. The material he notes is: "the initial consultation from Dr. Sundrani on April 19, 2004; HIV patient follow-up notes, I believe from Dr. Lutz; hospital records from St. Agnes Hospital Medical Center; laboratory record from St. Agnes Medical Center October 13, 2004, indicating his CD4 count of 1232; results of cardiac echo and Doppler dated April 2, 2004; consultation of Dr. Reddy, Infectious-Disease physician, dated February 26, 2004 and April 7, 2004; and the note from the Camino Medical Group." Dr. Berman opined: "The patient has many symptoms. From his own letter he reports having 'severe chronic fatigue, confusion, dizziness, cognitive dysfunction, insomnia, diarrhea, chronic headaches, depression, inability to concentrate, forgetfulness, lack of appetite, and nausea.' He was also evaluated by the cardiologist for chest pain and palpitations. He is on an antiviral regimen of Epivir, Zerit, and Sustiva." "Multiple physical examinations are normal. His laboratory data revealed that his

HIV infection is well controlled with a normal CD4 count."  "In summary, this is a patient with HIV, a broad array of symptoms, no physical abnormalities, and laboratory evidence of normal immunologic function. With a normal CD4 count, it is impossible for the HIV infection to be causing any of these symptoms. He has such a wide variety of symptoms, that I find it extremely unlikely that any of them would be related to the medications that he is taking for HIV infection. Side effects are described with the medications, but to have so many different types fffff would be virtually impossible." "His HIV infection is under good control. This diagnosis is not limiting the claimant's ability to work in any way. No restrictions or limitations should be expected on the basis of this diagnosis."

**D. Missing Records That Plaintiff Possesses**

The Plan's January 19, 1999 letter of denial is not in the Administrative Record.

Plaintiff's March 9, 1999 appeal letter to the Plan is not in the Administrative Record.

The Plan's March 17, 1999 letter to Beckstrand acknowledging receipt of appeal.  This letter is not in the Administrative Record.

The Plan's July 21, 1999 letter to Beckstrand reversing the decision to deny benefits. This letter is not in the Administrative Record.

The Plan's August 24, 2000 letter to Beckstrand notifying him that his claim was undergoing an any occupation review.

A termination of benefits letter from the Plan written on or about September 21, 2000. This letter is not in the Administrative Record.

**E. DEFENDANT'S COUNTER-STATEMENT OF MATERIAL FACTS**

On February 25, 2002, Dr. Lutz filed out a Long Term Disability Form.    Dr. Lutz checked a box indicating that the patient will obtain maximum improvement in 12-18 months. Dr. Lutz indicated that the patient could return to work on February 26, 2003.[2]

---

[2]  The court finds this statement accurately represents Defendant's evidence.

1    Beckstrand was examined by Manthani P. Reddy, M.D., for complaints of shortness of

2  breath and fatigue.  The tests performed by Dr. Reddy were normal. Dr. Reddy suspected

3  Beckstrand's symptoms were probably secondary to anxiety and/or depression.  With respect to

4  Beckstrand's HIV, Dr. Reddy stated that "from an HIV prospective, his viral load is undetectable

5  and his CD4 count is greater than 600 and he appears to be on a fairly good regimen of highly

6  anti-retroviral therapy."

7    A stress test performed by Rohit Sundrani, M.D. on April 19, 2004, was negative.

8    On August 12, 2004, Beckstrand told Reliance Standard that Dr. Lutz was his only

9  medical provider and that "he had not seen him in some time."   In a September 14, 2004 letter,

10  Beckstrand stated that he was waiting to see Dr. Lutz until after his appointment with Dr.

11  Sundrani.

12    Beckstrand's medical records were reviewed by Daniel Berman, M.D.  Dr. Berman

13  agreed that Beckstrand's HIV was well-controlled with a normal CD4 count.   According to Dr.

14  Berman, Beckstrand's HIV infection could not cause all of his symptoms.   Dr. Berman doubted

15  that Beckstrand's symptoms were related to the medications he was taking.

16    To qualify for a monthly benefit under the Plan, a claimant must be under the regular care

17  of a physician and submit to Reliance Standard satisfactory proof of total disability.

18    Under the policy, a monthly benefit terminates "the date you fail to furnish the required

19  proof of Total Disability."

20                              **LEGAL STANDARD**

21    In order for Plaintiff to prevail on its motion for partial summary judgment regarding the

22  standard of review, the court must find that, viewing the evidence most favorably to Defendant,

23  Plaintiff is clearly entitled to prevail on the issue of the standard of review as a matter of law.

24  See Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v.

25  Insurance Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.1987).   Rule 56 of the Federal Rules

26  of Civil Procedure allows for entry of summary judgment if Plaintiff can demonstrate the absence

27

28                                          11

of a genuine issue of material fact.    Fed.R.Civ.P. 56(c); <u>Celotex Corp</u>, 477 U.S. at 322. A fact is

"material"  when, under the governing substantive law, it could affect the outcome of the case.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact

arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." <u>Id</u>.

If a motion for summary judgment calls for the court to apply law to undisputed facts, it is

a mixed question of law and fact.  <u>HIH Marine Insurance Services, Inc. v. Virgin Atlantic</u>

<u>Airways</u>, 105 F.Supp.2d 1083, 1091 (N.D. Cal. 2000).  A mixed question of fact and law occurs

when the facts are undisputed, the relevant law is accepted, and the issue for the court is whether

the facts satisfy the legal rule.  <u>Pullman-Standard v. Swint</u>, 456 U.S. 273, 289 n. 19 (1982).

"When a mixed question of fact and law involves undisputed underlying facts, summary

judgment is appropriately granted."  <u>Han v. Mobil Oil Corp.</u>, 73 F.3d 872, 874 (9th Cir.1995); <u>In</u>

<u>re Software Toolworkers, Inc</u>, 789 F.Supp. 1489, 1495 (N.D. Cal. 1992).  Thus, where the case

turns on a mixed question of fact and law and the only dispute relates to the legal significance of

the undisputed facts, the controversy for trial collapses into a question of law suitable for

disposition on summary judgment.  <u>See</u> <u>Union Sch. Dist. v. Smith</u>, 15 F.3d 1519, 1523 (9th

Cir.1994); <u>Graham v. City of Chicago</u>, 828 F.Supp. 576, 583 (N.D.Ill.1993).  Finally, if a motion

for summary judgment questions only issues of law, the resolution of which does not involve

disputed material facts, summary judgment is also appropriate.  <u>Delbon Radiology v. Turlock</u>

<u>Diagnostic Center</u>, 839 F.Supp. 1388, 1391 (E.D. Cal. 1993).

## DISCUSSION

ERISA provides for judicial review of a decision to deny benefits to an ERISA plan

beneficiary. 29 U.S.C. § 1132(a)(1)(B).  It also creates federal court jurisdiction to hear such a

claim. 29 U.S.C. § 1132(e).  However, ERISA does not specify what legal standard the court

should apply in making this determination.  <u>Firestone Tire & Rubber v. Bruch</u>, 489 U.S. 101,

109 (1989).  Under the analysis approved by the Supreme Court in <u>Firestone</u>, a denial of benefits

1   is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary

2   authority to determine eligibility or to construe the terms of the plan." Id. at 115.  If the policy or

3   plan grants discretion to the plan administrator, the decisions of the administrator will be

4   reviewed only for an abuse of discretion.   Bendixen v. Standard Ins. Co., 185 F.3d 939, 943 (9th

5   Cir. 1999).

6          In some cases, de novo review of a decision denying benefits may be imposed despite the

7   fact the plan gives discretion to the administrator.  Where the plan gives an administrator or

8   fiduciary discretion, but there is a conflict between the fiduciary's or administrator's self-interest

9   and the interests of the plan's beneficiaries, the court may review a benefits denial decision de

10  novo.  See Bendixen, 185 F.3d at 943 (citations omitted).   The Ninth Circuit has recognized that

11  there is at least an apparent conflict of interest where a plan administrator is also the plan's

12  funding source.  Hensley v. Northwest Permanente P.C. Retirement Plan & Trust, 258 F.3d 986,

13  996 (9th Cir. 2001);  Friedrich v. Intel Corp., 181 F.3d 1105, 1109 (9th Cir.1999).

14         Even where a conflict of interest exists, however, imposition of the de novo standard is

15  not automatic.  The courts use a burden-shifting approach to determine which standard to apply

16  where a fiduciary or plan administrator is "apparently conflicted."   Hensley v. Northwest

17  Permanente P.C. Retirement Plan & Trust, 258 F.3d 986, 995 (9th Cir. 2001); Atwood v.

18  Newmont Gold Co., 45 F.3d 1317, 1322-23 (9th Cir. 1995).  First, the beneficiary must come

19  forward with "material, probative evidence, beyond the mere fact of the apparent conflict,

20  tending to show that the fiduciary's self-interest caused a breach of . . . fiduciary obligations to

21  the beneficiary."  Hensley, 258 F.3d at 995; Atwood, 45 F.3d at 1323.  If the beneficiary does not

22  meet this burden, "abuse of discretion" review is applied.   However, if the beneficiary is able to

23  make the necessary showing, the burden shifts to the fiduciary or administrator to show that the

24  conflict did not influence its decision to deny benefits.  Hensley, 258 F.3d at 995.  If it is unable

25  to do so, de novo review applies.   Hensley, 258 F.3d at 995; Atwood, 45 F.3d at 1323.

26  "[M]aterial, probative evidence may consist of inconsistencies in the plan administrator's

27

28                                        13

1   reasons, insufficiency of those reasons, or procedural irregularities in the processing of the

2   beneficiaries claims," <u>Nord v. Black & Decker Disability Plan</u>, 356 F.3d 1008, 1010 (9th Cir.)

3   (internal quotation and citation omitted), *cert. denied*, --- U.S. ----, 125 S.Ct. 62 (2004), as well

4   as the failure to provide a claimant a "full and fair' appeals procedure," <u>Friedrich v. Intel Corp.</u>,

5   181 F.3d 1105, 1110 (9th Cir. 1999) (quoting 29 U.S.C. § 1133(2)).

6       The Plan at issue here is a Reliance Standard Life Insurance Long Term Disability Policy.

7   In this case, the parties agree that the Plan gave the administrator discretionary authority to

8   determine benefits.   Based on the plan, the court may only review the denial of Plaintiff's

9   benefits for abuse of discretion.   However, Plaintiff contends that this case falls within the

10  exception to discretionary review because Reliance has a conflict of interest.

11      The parties agree that Reliance is the funding source and makes the eligibility

12  determinations.   As such, Reliance has an apparent conflict of interest when it makes benefit

13  eligibility determinations.   Because Reliance has an apparent conflict, the court must address

14  whether Plaintiff has come forward with material, probative evidence showing that Reliance

15  acted upon that conflict.

16  ***A.  Missing Documents***

17      Plaintiff contends that there are documents missing from the administrative record.   The

18  undisputed facts reveal that some records are missing from the administrative record.   Procedural

19  irregularities in the processing of claims is a factor the court may consider in determining if there

20  is evidence of self interest.   In <u>Friedrich v. Intel Corporation</u>, 181 F.3d 1105 (9th Cir.1999), the

21  Ninth Circuit held procedural irregularities in the initial claims process and an unfair appeals

22  process sufficiently demonstrated that the plan's conflict of interest affected its denial of benefits.

23  Courts have also found that removal of contrary evidence from the record does not comport with

24  full and fair claims review.   <u>Cannon v. UNUM Life Ins. Co. of America</u>, 219 F.R.D. 211, 215

25  (D. Me. 2004).

26      The missing letters cited by Plaintiff include letters between Reliance and Plaintiff

27

28                                      14

written in 1999 and 2000.   These letters concerned Reliance's earlier denial of benefits based on a lack of information.    At issue in this action is Reliance's denial of benefits on September 8, 2004.   There is no evidence or argument that the missing letters were relied on when denying benefits.   Defendant claims it denied benefits in 2004 because Plaintiff's condition had changed.   There is no evidence showing the absent records would assist Plaintiff.   As such, the court will not presume Defendant's failure to keep records not relevant to its current decision to deny benefits is material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that Defendant's self-interest caused a breach of its fiduciary obligations to Plaintiff.

**_B.  Changed Position_**

   Plaintiff contends that evidence of Defendant's change in position indicates a conflict of interest.   The Ninth Circuit has issued few opinions in which it has discussed the kind of showing necessary to satisfy the threshold requirement and to shift the burden to the Defendant. In both Lang v. Long Term Disability Plan, 125 F.3d 794 (9th Cir. 1997), and Tremain v. Bell Industries, 196 F.3d 970 (9th Cir.1999), the Ninth Circuit recognized that inconsistencies in the reasons given for the administrator's decision were sufficient to establish a rebuttable presumption that the administrator's conflict of interest affected its decision to deny benefits. In Lang, the insurance company handled the claim inconsistently, first denying benefits on the ground that the insured had no physical disorder, and then on the ground that her disability was not caused by the physical disorder that she had.  Lang, 125 F.3d at 799-800.

   Plaintiff provides evidence that Defendant's opinion of his ability to work based on Plaintiff's condition has changed.   In 2001, Dr. William Hortsman found that while a CD4 level is an easy objective parameter to follow, a patient's level of symptoms does not always correlate with the CD4 level.  Dr. Hortsman opined that the very drugs that are increasing CD4 levels are also responsible for disabling complaints, including Plaintiff's complaints of gastrointestinal upset, rash, depression, drowsiness, dizziness, insomnia, impaired concentration, abnormal

1   dreams, confusion, fever, cough, and shortness of breath.    At this time he was taking AMP,

2   Sustiva, 3TC, Bactrin, Celexa, Norvir IB, and Immodium.    In 2004, Defendant found that

3   Plaintiff should be able to return to work because his CD4 level was normal and the other

4   symptoms he reported were not side effects of his medications.    Plaintiff argues that nothing

5   changed after Dr. Hortsman's opinion.    Plaintiff claims both his medical condition and

6   medications did not change in any significant way.    Plaintiff contends this inconsistency is an

7   indication that Defendant's decision was tainted by self-interest.

8       Defendant contends that there was no inconsistency.    Defendant points out that in 2001,

9   Plaintiff's CD4 levels were much lower, but by 2004 they were considered normal.  Defendant

10  also points out that Plaintiff was not on the same medication in 2001 and 2004 and there is no

11  evidence to support Plaintiff's opinion his medications did not change significantly.   In April

12  2004 Plaintiff was taking Pravoachol, Sustiva, Epivir, Zerit, and Celexa.

13      The present case is distinguishable from Lang.   The distinguishing factor is that in Lang,

14  the inconsistency was in the method of determinating when a disability was caused by a mental

15  disorder.   In Lang, the defendant initially stated that the plaintiff's benefits were terminated

16  because she did not have fibromyalgia.  Id. at 799. The defendant's view at that time was that the

17  plaintiff had not shown that her disability was "caused or contributed to" by a physical ailment.

18  Id.   On review, when confronted with clear evidence from her treating physician that she did

19  suffer from a physical ailment – fibromyalgia – the defendant took the position that the plaintiff

20  would have to make a further showing that the fibromyalgia "in and of itself" was disabling.  Id.

21  The defendant also justified its denial on the theory that, regardless of the cause of the disability,

22  the critical determinants of whether a person was afflicted with a "mental disorder" were

23  symptoms and not causes. Id.

24      Here, in contrast to Lang, Defendant gave the same factor for its determination that

25  Plaintiff was not disabled – Plaintiff's CD4 levels were normal, Plaintiff's symptoms were not

26  caused by the medications, and Plaintiff was not being currently treated by a doctor.   While

27

28                                      16

Defendant had earlier found Plaintiff disabled, this finding was at a time when Plaintiff's CD4 levels were lower, he was on different medications, and this conclusion was based upon information available in 2001.  The evidence shows Plaintiff's situation changed between 2001 and 2004.  If Plaintiff wishes to contend that Defendant is incorrect and the current medications do cause Plaintiff's symptoms, he is entitled to make this argument.  However, this does not affect the standard of review.

### C.  Opportunity to Submit Additional Information

Plaintiff next contends that Defendant did not provide him with the additional material or information necessary to perfect his claim and did not provide an explanation why the information was necessary.  Defendant contends that it did provide Plaintiff with information and was not required to provide to the Plaintiff the reports on which Defendant relied.

Plaintiff cites to Booton v. Lockheed Medical Benefit Plan, 110 F.3d 1461 (9th Cir.1997), to support his contention that he was denied the opportunity to provide information. The plaintiff in Booton was kicked in the teeth by a horse.  To repair the plaintiff's front teeth her dental surgeon had to build a bridge to the back teeth to reset her front teeth.  To do this, her dental surgeon had to prepare her back teeth so that they would hold the bridge.  Id. at 1464. The plan administrator turned down the plaintiff's claim for the work on the back teeth without ever asking why it had to be done on the ground that the horse did not kick the plaintiff in her back teeth.  Id. at 1462.  When denying the claim, the administrator "sent out a stream of cookie-cutter denial letters" without providing details.  Id.  The administrator issued only one or two sentence responses to the plaintiff, which did not indicate what the plaintiff needed to show.  Id. at 1462 n. 5.  The record showed that the plaintiff's dentists "were ready and able to explain their work but no one . . . sought their explanations."  Id.  The Ninth Circuit held that the denial of the claim without explanation and without obtaining evidence of the plaintiff's rational explanation was an abuse of discretion.  Id. at 1463.

Similarly, in Friedrich v. Intel Corp., 181 F.3d 1105 (9th Cir. 1999), the Ninth Circuit

found de novo review appropriate because there was an "inadequate dialogue" between the defendant and the plaintiff before denying benefits.   In Friedrich, the Ninth Circuit found the defendant failed to follow internal procedure, failed to provided the plaintiff with sufficient notice of the denial of his claim, and provided an unfair review procedure.   Id. at 1110. Specifically, the plan administrator did not provide a claim packet that would have given the plaintiff notice that he was required to apply for benefits and the criteria for benefits determinations.   Id. The plaintiff did not know the defendant was even reviewing his claim, and did not submit anything regarding his claim until it had already been denied.   Id.   Additionally, the court in Friedrich based its finding that the Plaintiff was not given a full and fair appeals procedure under 29 U.S.C. § 1133(2) because the appeals committee only had raw data from the plaintiff's physicians, which denied the plaintiff the opportunity to demonstrate disability on the basis of Chronic Fatigue Syndrome.   Id.

     In contrast to the situation in Fredrick, Defendant advised Plaintiff of its decision to deny his claim for long term disability benefits by a letter in which Defendant provided the definition of disability and the information on which the denial was based.   Specifically, Defendant advised Plaintiff that the records from Dr. Lutz and Dr. Reddy indicated that Plaintiff's CD4 and viral load levels were within normal limits.   Defendant also advised Plaintiff that Dr. Lutz was Plaintiff's only treating physician and Plaintiff had not seen him recently.   Additionally, the letter invited Plaintiff to send additional information to Defendant for review and instructed Plaintiff how to submit an appeal.   Plaintiff appealed the decision.   In the appeal, Plaintiff indicated the symptoms he believed were from the HIV infection and medications he was taking.   Defendant then notified Plaintiff of the time frame for the review, and later advised Plaintiff of the need for an extension.   Defendant notified Plaintiff that the denial of his claim for long-term disability benefits was upheld on appeal in a letter that again set forth the definition of disability and detailed the medical and information on which the denial was based.  Besides the reasons given earlier, the appeal letter reviewed additional records, including Dr.

Berman's analysis.   Based on Dr. Sundrani's records, Dr. Reddy's previously submitted records, and Dr. Berman's analysis, Defendant concluded the symptoms complained of were not all caused by the HIV infection and medications.   The letters and explanations Defendant provided to Plaintiff at every step of the claim process do not compare to the complete lack of communication in <u>Friedrich</u>, and cannot be construed to show a lack of "meaningful dialogue."

In addition, Defendant's letters to Plaintiff and his doctors make this case different from the factual scenario presented in <u>Booton</u>.   Here, Defendant tried to get further information regarding Plaintiff's condition from Plaintiff's doctors and Plaintiff.   Defendant's correspondence with Plaintiff sufficiently informed him of the medical information which it needed.   The fact that Defendant did not sua sponte mail Plaintiff copies of all reports it received does not show a conflict of interest.   In addition, the record does not show that Plaintiff's treating physician, or any other physician, was "ready and able to explain" that Plaintiff was still disabled despite his normal CD4 count because of his current medication's side effects.   To the contrary, Plaintiff informed Defendant that he had not seen Dr. Lutz in some time.   When Dr. Lutz's September 29, 2004 report was provided as part of the appeal, Dr. Lutz notes confirmed Plaintiff had been having fatigue, nausea, and diarrhea, but did not state what was causing these symptoms.   Thus, Plaintiff was given time to submit additional information, and Plaintiff has not established Defendant abused its discretion because it appears Defendant considered all evidence submitted by Plaintiff.   Whether Defendant made the right decision based on the evidence is not an issue currently before the court.

Plaintiff also contends Defendant abused its discretion because Plaintiff was not given an opportunity to respond to Defendant's reasons for its final denial.   The opinion of Dr. Berman was not sought until after the initial denial and Plaintiff's appeal.   Plaintiff points out that he never was given the opportunity to respond to Dr. Berman's opinion that neither HIV nor Plaintiff's medications could be causing Plaintiff's reported symptoms.

There is support for the contention that an administrator should not reveal a reason for

19

1   its decision until its final decision to deny coverage, preventing the claimant from challenging

2   its conclusion in the course of the administrative review.  See Abram v. Cargill, Inc., 395 F.3d

3   882, 886 (8th Cir.2005) (concluding that claimant was denied an opportunity to meaningfully

4   participate in the appeals process where he was not provided information that served as the basis

5   for the Plan's denial of benefits until after the Plan's decision); Marolt v. Alliant Techsystems,

6   Inc., 146 F.3d 617, 620 (8th Cir.1998) (determining ERISA claimants are not to be "sandbagged"

7   by later justifications of decisions).    However, there is no support in the Ninth Circuit for

8   Plaintiff's contention that Defendant should not have relied on Dr. Berman until Plaintiff was

9   given an opportunity to respond to Dr. Berman.

10          The Ninth Circuit has found that an actual conflict exists where an administrator has

11   presented inconsistent reasons for a denial that emerged after the administrator's first ground for

12   denial was rebutted by clear evidence. Lang, 125 F.3d 794 at 799.   However, the Ninth Circuit

13   has never held that an ERISA administrator's assertion of a supplemental reason for denying a

14   claim subsequent to the initial denial is sufficient evidence to demonstrate that a plan

15   administrator has breached its fiduciary duties to the beneficiary.   Defendant's final

16   determination was the only decision that it rendered based on the entire administrative record.

17   A plan administrator could not be expected to articulate all reasons for denial until the

18   administrative record is complete.   Further, Defendant's invocation of the additional reason for

19   denial on appeal did not procedurally prejudice Plaintiff.   Since the initiation of the appeal,

20   Plaintiff knew that he needed documentation showing that his symptoms were caused by his

21   HIV infection and HIV medications.   Plaintiff knew that Dr. Reddy had opined that Plaintiff's

22   symptoms were being caused by anxiety and not HIV or the medications.

23          There is no rule in the Ninth Circuit that an ERISA administrator, after failing to raise a

24   denial reason in the initial benefit determination, is stopped from invoking that reason for denial

25   upon appeal.   The Act simply provides that at the initial stage of review the administrator must,

26   upon denying a claim, and "[i]n accordance with regulations of the Secretary" of Labor, provide

27

28                                                    20

1  adequate, understandable notice that "set[s ] forth the specific reasons for such denial." 29

2  U.S.C. § 1133(1). The Act requires that there be a "reasonable opportunity" to appeal a denial of

3  a claim "for a full and fair review by the appropriate named fiduciary." 29 U .S.C. § 1133(2)

4  (emphasis added).   The statute's dictate that the appellate body's review be "full and fair"

5  suggests that the appellate administrative body is not limited to a review of the reasons

6  articulated by the administrator who initially denied the claim.   Thus, the court finds that

7  Defendant did not breach its fiduciary duties to Plaintiff by relying on Dr. Berman, whose report

8  and conclusions were not provided to Plaintiff.

9  ***E.   Reasons for Denial***

10       Plaintiff contends due novo review is required because there was insufficient reasons for

11  the termination of benefits.   Plaintiff contends that there is no evidence in the record, as

12  opposed to the unsubstantiated speculation of Dr. Reddy and Dr. Berman, to support

13  Defendant's actions.    Plaintiff again points to Dr. Hortsman's report, in which Dr. Hortsman

14  opined that Plaintiff's HIV medication prevented him from working.   Plaintiff asks the court to

15  take judicial notice of the potential side effects to the medications he was taking.[3]   Plaintiff

16  claims this evidence refutes Dr. Reddy's and Dr. Berman's opinions that Plaintiff's ailments

17  were not caused by Plaintiff's HIV and Plaintiff's HIV medication.

18       Insufficiency of the reasons in denying benefits can constitute evidence of an actual

19  conflict of interest. Nord v. Black & Decker Disability Plan, 356 F.3d 1008, 1010 (9th Cir.

20  2004).   When an administrator arbitrarily refuses to credit a claimant's reliable evidence,

21  heightened review may be called for if the administrator's decision as a whole is without "a

22  reasonable basis."   Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869,

23  879 (9th Cir. 2004); see also Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

24  However, as long as the record demonstrates that there is a reasonable basis for concluding that

25

26       [3] For the purposes of this motion only, the court will take judicial notice of the potential

27  side effects of Plaintiff's medications.

28                                             21

the medical condition was not disabling, the decision cannot be characterized as arbitrary, and the court must defer to the decision of the plan administrator.  Jordan, 370 F.3d at 879. Because the court is dealing with an alleged procedural violation of ERISA's requirement for "full and fair review," heightened review would be called for only if the violation was "so flagrant as to alter the substantive relationship between the employer and the employee, thereby causing the beneficiary substantive harm."  Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005).

Dr. Reddy and Dr. Berman concluded Plaintiff's symptoms, which Plaintiff claimed prevented him from working, were not all caused by Plaintiff's HIV and HIV medications. Thus, there was a basis for Defendant's decision.  Plaintiff contends that Defendant improperly based the decision on the speculation of Dr. Reddy and Dr. Berman instead of Plaintiff's own description of his symptoms and the prior report by Dr. Hortsman.   Here, Defendant had a basis for its opinion.   There is a reason for the administrator to not discuss the prior opinion of Dr. Hortsman.   It was three years old and written at a time when Plaintiff was on different medications and had different C4 levels.   Plaintiff's treating physician previously found Plaintiff unable to work, but there was no evidence from Plaintiff's treating physician on why Plaintiff would be unable to work if Plaintiff's C4 levels were normal.   Even after the initial denial was made on the ground that Plaintiff's CD4 count was normal, Plaintiff did not provide evidence from any physician of their opinion of whether Plaintiff could work.   In essence, Plaintiff has cited his disagreement with Defendant's conclusion that Plaintiff's symptoms were exaggerated or the result of another condition.  Plaintiff may still contend Defendant was incorrect in taking the view that Plaintiff's HIV and HIV medications made Plaintiff disabled, however de novo review is not warranted because there was evidence to support this finding.

### F.  Care of a Physician

Plaintiff contends that Defendant's decision was inconsistent with the Plan's terms.

22

1  Plaintiff argues the Plan only required him to be under the regular care of a physician.   Plaintiff

2  contends Defendant denied him benefits because he was not under the regular care of a

3  psychiatrist, but nothing in the Plan required Plaintiff to be under the care of a psychiatrist.

4  Defendant contends Plaintiff has mischaracterized Defendant's denial.

5      In its December 15, 2004 appeal denial letter, Defendant referenced Dr. Berman's

6  conclusion that Plaintiff may be suffering from depression.   In that letter, Defendant cited the

7  fact that Plaintiff was not under the care of a psychiatrist or therapist for depression.

8  Defendant then concluded that to the extent Plaintiff's disability was caused by depression,

9  Plaintiff's failure to under the care of a psychiatrist or therapist and provide records concerning

10  this condition prevented Defendant from assessing any disability based on depression.

11      There appears to be a disputed issue of fact on whether Plaintiff was under the care of a

12  physician.   Plaintiff claims he was under the care of Dr. Lutz, and he had been waiting to see

13  him until other tests could be completed.   Defendant cites to Plaintiff's admission that he had

14  not seen Dr. Lutz in some time.   The September 2, 2004, initial denial of benefits letter cited

15  the absence of records documenting Plaintiff was under the regular care of a physician.

16  However, the December 15, 2004 appeal denial letter does not list Plaintiff's failure to be  under

17  the regular care of a physician as a reason for the denial.   The December 15, 2004 letter

18  recognizes why Plaintiff did not see Dr. Lutz for some time, and states Defendant did consider

19  new records from Dr. Lutz.   The reference to a treating psychiatrist is made only after

20  Defendant concludes Plaintiff's symptoms are primarily caused by depression, not HIV or HIV

21  medications.   Because there is no evidence that Dr. Lutz or anyone else treated Plaintiff for

22  depression, Defendant did not clearly error in finding Plaintiff was not being treated by a

23  physician for the symptoms Defendant believes caused Plaintiff's disability.    That Plaintiff

24  disagrees with Defendant's conclusion that Plaintiff's condition was caused by depression and

25  not his HIV medications is well documented.   However, because Defendant did have a basis for

26  its conclusion, the court cannot find Defendant's reference to the need for a treating psychiatrist

27

28                                                    23

1    placed requirements on Plaintiff beyond those required by the Plan, requiring de novo review.

2    *F. Time*

3           Plaintiff contends that Defendant was required to act on Plaintiff's appeal within 60

4    days.   In this case, Plaintiff's appeal was received on September 27, 2004.   Within a few

5    weeks, requests for updated records were sent to Dr. Lutz and Dr. Sundrani.   Defendant wrote

6    again to Dr. Sundrani on November 10, 2004, when he failed to respond to the request for

7    records.   Due to the delays, Defendant notified Plaintiff that it would be taking an additional

8    time to decide the appeal.   When all records were received, they were sent to Dr. Berman for

9    review and comment.   Defendant issued its final decision on December 15, 2004, long before

10   120 days had passed.

11          In Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection

12   Plan, 349 F.3d 1098 (9th Cir.2003), the Ninth Circuit held that the standard of review for the

13   termination of benefits was de novo when the plan itself and Department of Labor regulations

14   required the administrator to respond to a beneficiary's appeal within a certain time frame or the

15   decision was "deemed denied."   Id. at 1105-07.   The court concluded that the failure to rule on

16   the appeal, seek an extension, or engage in a meaningful dialogue within the appeal period

17   forfeited the right to an abuse of discretion review.   Id.   The rational of Jebian does not apply to

18   this case.   The Ninth Circuit's holding in Jebian was limited to cases where the plan itself

19   provides that a decision is "deemed denied" if not decided within the deadline.   Id. at 1105-06.

20   The majority in Jebian, responding to criticism by the dissent, stressed the fact that "the

21   limitation on the exercise of discretion upon which we rely is expressly contained in the plan

22   itself."   Id. at 1106 n. 6.   Unlike in Jebian, there is no evidence in this case that the Plan had a

23   specific provision that made decisions not made or extended during the appeal period "deemed

24   denied."

25          Plaintiff next argues that the Department of Labor regulations applicable to Plaintiff's

26   claim required Defendant to respond to the appeal within 60 days.   See 29 C.F.R. § 2560.503-

27

28                                                    24

1(h).  This argument, however, is foreclosed by recent Ninth Circuit authority holding that a

plan administrator's violation of the time limits established by § 2560.503-1(h) does not

implicate the standard of review.  <u>Gatti v. Reliance Standard Life Ins. Co.</u>,415 F.3d 978 (9th Cir.

2005).   Despite Plaintiff's belief that <u>Gatti</u> was incorrectly decided, the court must follow this

case as precedent.   Thus, Plaintiff's arguments that Defendant did not issue its decision within

60 days does not create a conflict of interest.

### *G.  Prior Denials*

Plaintiff contends that the Plan's denial or termination of benefits to him four times in

six years is evidence that Defendant acted as an adversary bent on denying his claim.   The

denial at issue in this action was Defendant's fourth denial of Plaintiff's benefits.   In January

1999, Defendant first denied benefits because there was no evidence of Plaintiff having been

treated or formally tested for cognitive dysfunction and fatigue and the chart notes contain no

reference or objective findings to support your inability to perform work due to cognitive

dysfunction and fatigue.    When Plaintiff submitted additional evidence, the Plan reversed its

decision.   In September 2000, the Plan terminated Plaintiff's benefits for a second time.  The

benefits were again reinstated over considering additional evidence.  In November 2003 the Plan

terminated Plaintiff's benefits for the third time because Plaintiff had not submitted requested

information. By office memo dated January 6, 2004, Plaintiff's benefits were reinstated because

Plaintiff's condition had not changed.   However, this memo indicated further that the medical

records were limited and suggest an independent medical examination.   In September 2004, the

Plan terminated Plaintiff's benefits for the fourth time for, among other reasons, Plaintiff's viral

load was undetectable, his CD4 count of greater than 600, and the medical information does not

support impairment.   This fourth denial is at issue in this action.

At first glance, the fact Defendant denied benefits four times raises questions as

Defendant's motive.   The prior denials were based on a lack of evidence, and Defendant

reinstated benefits upon receiving more evidence from Plaintiff.   The fourth and final denial

was based on lack of records and evidence of Plaintiff's viral load and CD4 count.   The burden to show an actual conflict of interest lies with Plaintiff.   See Atwood, 45 F.3d at 1322.   The evidence before the court shows that Defendant did deny benefits for lack of evidence on several occasions.   However, the evidence also shows that Defendant reinstated benefits upon obtaining more information.   Because the only evidence indicates Defendant did review the evidence before it and change prior findings in light of new evidence, the court cannot find that Plaintiff has shown such a conflict of interest tending to show that Defendant's self interest caused a breach of Defendant's obligations.

The court does not find that Defendant's conflict of interest as both plan administrator and the source of plan funds tainted its decision.   Plaintiff's objective medical tests and medications changed.   The Ninth Circuit has found an actual conflict to exist where an administrator has presented inconsistent reasons for denial that emerged after the administrator's first ground for denial was rebutted by clear evidence. Lang, 125 F.3d 794 at 799.   The Ninth Circuit has never held that an ERISA administrator's supplemental denial after a claim was originally granted is sufficient evidence to demonstrate that a plan administrator has breached its fiduciary duties to the beneficiary.   Thus, de novo review is not required.

## CONCLUSION

Accordingly, based on the above memorandum opinion the court ORDERS that:

1.   Defendant's motion for summary judgment is DENIED; and

2.   The standard of review for Plaintiff's cause of action will be abuse of discretion.


IT IS SO ORDERED.

**Dated:    October 31, 2005**             _____/s/ Anthony W. Ishii_____
0m8i78                                     UNITED STATES DISTRICT JUDGE

26