IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYAN BECKSTRAND,<br><br>        Plaintiff,<br><br>   v.<br><br>ELECTRONIC ARTS GROUP LONG TERM DISABILITY INSURANCE PLAN,<br><br>        Defendant. | 1:05-CV-0323 AWI GSA<br><br>AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br>ORDER DIRECTING CLERK OF THE COURT TO ENTER JUDGMENT |

**BACKGROUND**

Plaintiff Bryan Beckstrand's March 7, 2005 complaint for declaratory relief arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1) & (3), *as amended*, ("ERISA").  The complaint alleges that Beckstrand has been diagnosed as suffering from HIV and the complications associated with this disease.  The complaint alleges that Beckstrand is totally disabled under the terms of Defendant's long term disability plan ("the Plan").  The complaint alleges that on September 8, 2004, Defendant terminated Beckstrand's benefits stating that the medical information it had did not continue to support impairment from a less than sedentary occupation.  Beckstrand requests a judicial determination of his rights and a

declaration finding that Defendant is obligated to pay long-term disability benefits.

After the parties filed cross motions for summary judgment, on December 13, 2005, the court held a bench trial.  The court then entered Findings of Fact and Conclusions of Law that found Beckstrand had failed to prove his claims for relief, and the court directed the Clerk of the Court to enter judgment for Defendant.

On January 19, 2007, the parties filed a joint request for the court to vacate judgment in light of a new Ninth Circuit case.  On September 27, 2007, Beckstrand filed a pretrial brief.  On September 28, 2007, Defendant filed a pretrial brief.  On December 14, 2007, the parties submitted to the court proposed Findings of Fact and Conclusions of Law.  On July 9, 2008, the parties stipulated to file additional briefs concerning a new Supreme Court case.  On July 11, 2008, Beckstrand filed a supplemental brief.  On July 17, Defendant filed a supplemental brief.

Having reviewed the parties' proposed Findings of Fact and Conclusions of Law, the parties' briefs, the Administrative Record ("AR"), and case authority, the court issues this amended Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

**Overview of the Plan**

1. Pursuant to the Plan, totally disabled and total disability mean that as a result of an injury or sickness, during the elimination period (of 90 days) and for the first 24 months for which a monthly benefit is payable, the employee cannot perform the material duties of his regular occupation; after a monthly benefit has been paid for 24 months it means the employee cannot perform the material duties of any occupation. Any occupation is one that the employee's education, training or experience will reasonably allow. The Plan considers an employee totally disabled if due to an injury or sickness the employee is capable of only performing the material duties on a part time basis or part of the material duties on a full time basis.  AR 0658.

2. The Plan has the right, at its expense, to have an employee interviewed or examined,

including psychologically and/or psychiatrically, to determine the existence of any total disability which is the basis for a claim. This right may be used as is often as is reasonably required while a claim is pending. AR 0662.

3. The Plan states that monthly benefits will be paid if you: "(1) are Totally Disabled . . ., (2) are under the regular care of a Physician; (3) have completed the Elimination Period; and (4) submit satisfactory proof of Total Disability to us." AR 0665.

4. Plan benefits are fully insured. AR 0676.

**Plan's Early Actions on Beckstrand's Claim**

5. Beckstrand lived and worked in the San Jose, California area when he became disabled.

6. At that time, Beckstrand's primary treating physician was Dr. Razzeca at the Camino Medical Group.

7. After Beckstrand became disabled he moved to the Fresno area, and Dr. Lutz became his primary treating physician. He also saw Dr. Sundrani for a cardiac evaluation.

8. Beckstrand stopped working on June 2, 1998. AR 0034.

9. Although his request for benefits was initially denied, his appeal of that denial was granted and Beckstrand was awarded benefits. See Beckstrand Declaration, Exhibit 4.

10. Benefits were terminated on or about September 21, 2000. See Beckstrand Declaration ¶ 7. Beckstrand again appealed. AR 0215.

11. The Plan had Dr. William Hauptman, Board Certified in Gastroenterology, Board Certified in Internal Medicine, Board Certified in Quality Control Assurance and Utilization review Beckstrand's file. AR0211. Dr. Hauptman's January 11, 2001 report states:

> "Mr. Beckstrand has AIDS and is treated with multiple medications his date of disability is June 3, 1998. I reviewed the occupational description of computer programming that indicates the work is sedentary." AR 0211.
>
> * * * *
>
> An MRI of the brain was obtained July 14, 1999. This was

3

abnormal and showed punctate regions of increased signal in the subcortical and periventral frontal white matter which were felt to be nonspecific representing possible sequelae of prior infection, small vessel ischemic changes or focal regions of demyelination." AR 0212.

\* \* \* \*

"In an office note dated February 8, 2000 Dr. Razzeca documents the treatment regimen including Sustiva, Agenerase, 3TC, and D4T. She notes patient's complaints of increasing fatigue, nightsweats and depression. She documents that the patient is having difficulty tolerating medications with persistent diarrhea and cramping as well as skin rashes with intense itching. She documented that fatigue was the major problem and was intensified by depression. Therefore by February 8, 2000 the medical records document continued complaints secondary to both the primary HIV infection and the medication regimen." AR 0213.

\* \* \* \*

"I reviewed the disability review questionnaire filled out by Mr. Beckstrand around May, 2000. He documented that he could not concentrate well, was easily winded, had difficulty sleeping, had severe and frequent diarrhea, no appetite, dizziness, headaches, and clumsiness. He documented his current medications including Agenerase, Epivir, Zerit, Sustiva, Norvir, Diflucan, Ultrase, Celexa, Acyclovir, and Bactrim." AR 0213-0214.

\* \* \* \*

"The final office note I have available for review is from September 11, 2000. This office note continues to document complaints of fatigue, chronic headaches, insomnia, decreased concentration and diarrhea. The physician documents 'continues to be plagued with a variety of constitutional ailments.' The CD4 level was documented to be 394. The doctor documented her opinion that the decreased concentration was most likely due to the medication Sustiva." AR 0214.

"I reviewed correspondence between Bryan Beckstrand to Reliance dated September 28, 2000. Mr. Beckstrand documents his continued complaints including 'severe chronic fatigue, confusion, dizziness, cognitive dysfunction, insomnia, severe diarrhea, chronic headaches, depression, inability to concentrate, forgetfulness, lack of appetite, and nausea.'" AR 0214.

"It is my opinion within a reasonable degree of medical certainty that the medical records through September 11, 2000 continue to support impairment with resultant less than sedentary restrictions and limitations. While the CD4 level is an easy objective parameter to follow, the patient level of symptoms does not always correlate with the CD4 level. This of

4

course is true if the very drugs that are increasing the CD4 level are also responsible for the disabling complaints. The medical records document consistent complaints of fatigue, insomnia, decreased concentration, diarrhea and depression. These complaints are consistent with both the underlying HIV infection and even more so with the medication regimen. The protease inhibitors which this patient is on have numerous side-effects including gastrointestinal upset, rash, depression, drowsiness, dizziness, insomnia, impaired concentration, abnormal dreams, confusion, fever, cough and shortness of breath. Mr. Beckstrand's complaints are consistent with his medication regimen. The medical records consistently document these complaints. It is my opinion that these complaints, particularly the fatigue and decreased concentration, impair the patient resulting in less than sedentary restrictions and limitations." AR 0214.

12. The Plan reinstated Beckstrand's benefits. AR 0193.

13. By letter dated June 21, 2001, the Plan notified Beckstrand that the change in definition of total disability to "any occupation" investigation was complete and it had concluded:

> "Based on the latest medical information received from Camino Medical Group, you are totally disabled from performing any occupation as defined in the group policy provision stated above. As a result, benefits will continue to June 3, 2032 or until you no longer meet the provisions of your policy, whichever comes first." AR 0017.

14. Benefits were terminated again by letter dated November 19, 2003. AR 0100-03.

15. Benefits were reinstated January 6, 2004. AR 0097.

16. In a January 6, 2004 interoffice e-mail from RSL's Heather McCulloch to RSL's Martha McCullough, Ms. McCullough noted:

> "EE off work since 6/3/98. Primary symptoms appear to be fatigue and GI upset, possible side effects of medications. CD4 and viral load are within normal limits. There does not appear to be any change in the employee's medical condition since the previous medical review however the medical records are very limited. I would recommend obtaining an IME for more detailed findings regarding EE's current medical condition. Based on information reviewed it would appear the medical would continue to support restrictions and limitations of less than sedentary work through completion of the IME." AR 0097.

**Medical Records**

17. Between February 8, 2000 and February 25, 2002, Beckstrand's medical records show routine reports of fatigue, diarrhea, and inability to concentrate. AR 0577 (2/8/00); AR

5

|   |     |     |
|---|-----|-----|
| 1 |     | 0554 (2/8/00);  AR 0553 (3/14/00); AR 0551 (4/13/00); AR 0572-76 (4/20/00); AR 0549 |
| 2 |     | (5/11/00); AR 0239 (8/21/00);  AR 0240 (9/11/00); AR 0507-08 (12/3/01); AR 0504-05 |
| 3 |     | (1/10/02); AR 0494-95(2/25/02). |

18. Dr. Lutz's January 20, 2003 records state: "Feels about the same. C/o fatigue, diarrhea. Has 1 to 5 stools, usually loosely formed but sometimes extremely watery. Some crampy abdominal discomfort. . . . lipids too high." AR 0442-43.

19. Dr. Lutz's March 3, 2003 records state: "Now on Pravachol 80 mg./day. Still with much fatigue. . . .diarrhea 5/d, takes loperamide [two] once daily. . . . paresthesis, numbness, low back pain, legs. . . . stable but chronic fatigue and chronic diarrhea preclude gainful occupation at this time."AR 0440-41.

20. Dr. Lutz's April 3, 2003 records state: "Fever to 101.2. Onset yesterday. Sweats, headache. No sore throat slight nonproductive cough. . . . Probably viral URI. Influenza not excluded." AR 0438-39.

21. Dr. Lutz's July 16, 2003 records state: "C/o increased fatigue." AR 0434.

22. A February 23, 2004 medical report notes chest pain.  AR 0389-91

23. Dr. Lutz's February 23, 2004 records state: "went to urgent care. Had respiratory tract infection. . . . fever 101.9. . . .subsequent sharp chest pain, present several months 2 or 3x/week. . . . nausea."  AR 0395.

24. Dr. Lutz's records for April 3, 2003, indicate a fever, headache, and cough.  Dr. Lutz notes a possible viral URI or influenza.  AR 0438-39.

25. Dr. Lutz's June 11, 2003 records focus on Beckstrand's back pain.  Dr. Lutz notes Beckstrand's HIV is stable.  AR 0436-37.

26. Dr. Lutz's July 16, 2003 records indicate fatigue, Beckstrand is stable, and the "usual" tests were ordered.  AR 0434-45

27. Dr. Lutz's October 15, 2003 records indicate a little difficulty swallowing, but find Beckstrand is stable.  AR 0432-33.

6

28. Dr. Lutz's February 23, 2004 records focus on Beckstrand's current bronchitis. Dr. Lutz indicates that Beckstrand had nausea and "abdominal" is circled as positive. Dr. Lutz finds Beckstrand stable. AR 0395-96.

29. The Plan scheduled an independent medical examination of Beckstrand with Dr. Manthani Reddy. AR 0417.

30. On February 26, 2004, and April 7 2004, Dr. Reddy examined Beckstrand. Dr. Reddy did not report that Beckstrand was suffering from diarrhea or nausea. Dr. Reddy did report fatigue. Dr. Reddy also reported a history of sleep disturbance, anxiety, and depression. AR 0417-18.

31. Dr. Reddy concluded his report by saying "I suggest the patient to be seen probably by a psychiatrist for an optimal regimen of anxiety and depression. From an HIV prospective, his viral load is undetectable, and his CD4 count is greater than 600 and [he] appears to be on a fairly good regimen of highly antiretroviral therapy." AR 0419.

32. On April 19, 2004, Beckstrand was taking Epivir, Zerit, and Sustiva, Celexa, and Pravachol. AR0410.

33. Dr. Sundrani's April 19, 2004 records regarding his Initial Cardiac Evaluation stated:

> "[Beckstrand] has been having chest pain, which is retrosternal. . . .There is a suggestion of mild sleep apnea. . . . History of hyperlipidemia because of reverse transcript ACE inhibitors. . . . This chest pain is fairly atypical. He has risk factors for coronary artery disease, which includes hyperlipidemia because of reverse transcript ACE inhibitors. There is a suggestion of pain always after exertion. Considering this, I would like to do a stress echocardiogram." AR 0383-85.

34. Dr. Sundrani's June 25, 2004 records state: "This maximal stress echocardiogram is negative for any stress induced ischemia or arrhythmia. His chest pain is most likely noncardiac in origin. The patient was explained these results in detail." AR 0386.

35. Dr. Lutz's September 29, 2004 records state: "tries to exercise e.g., weight lifting, bicycling. However, often too fatigued to do so. . . . Fatigue . . . nausea . . . diarrhea. . . 3or 4 a day . . . HA[headaches] . . ." AR 0392.

7

36. A September 29, 2004 form filed out by Dr. Lutz finds: "HIV (not AIDS), High lipids, Chronic fatigue. . . . f/u two months." AR 0394.

37. A CD4 count of 600 or above is normal. A viral load of under 50 is normal.

38. Beckstrand's lab results show that his CD4 count was always above 600 except the testing done on October 2, 2001. Beckstrand's lab results show that his viral load has always been below 50 except the lab results of October 2, 2001. At this time, Beckstrand did not have medication and therefore was off his anti-virals. AR 0517-18.

**Final Denial of Benefits**

39. Beckstrand's benefits were denied by letter dated September 8, 2004, see AR 0075-78, and Beckstrand appealed.

40. In the appeal, dated September 27, 2004, Beckstrand stated that the medication he was taking had side effects, including severe chronic fatigue, confusion, dizziness, cognitive dysfunction, insomnia, diarrhea, chronic headaches, depression, inability to concentrate, forgetfulness, lack of appetite, and nausea. AR 0071.

41. The Plan obtained Beckstrand's medical records, and had Dr. Daniel S. Berman review Beckstrand's records. AR 0047.

42. Dr. Berman described Beckstrand's physical condition as follows: "His HIV infection is under good control. This diagnosis is not limiting the claimant's ability to work in any way. No restrictions or limitations should be expected on the basis of this diagnosis." AR 0048.

43. Dr. Berman stated that it was extremely unlikely that Beckstrand's medications could be causing his symptoms because he had "so many different types, [it] would be virtually impossible." AR 0047. Dr. Berman stated he believed Beckstrand's symptoms might be related to depression. AR 0047.

44. On December 1, 2005, Defendant called Beckstrand and asked if he had ever been seen by a therapist, psychologist, or psychiatrist for treatment of any psychiatric problems.

|   |     |                                                                                        |
|---|-----|----------------------------------------------------------------------------------------|
| 1 |     | Beckstrand said no.   AR 0058.                                                         |
| 2 | 45. | Beckstrand's appeal was denied by letter dated December 15, 2004.   AR 0042-46.        |

**Additional Information**

46. There is no evidence in the record that any doctor or anyone on behalf of the Plan advised Beckstrand to see a psychologist or psychiatrist or otherwise informed Beckstrand the Plan had determined Beckstrand's symptoms may be related to a psychological condition.

47. Beckstrand began taking Celexa for depression on March 14, 2000, prior to Dr. Hauptman's January 11, 2001 report. AR 0213.  This medication was originally prescribed by Dr. Razzeca, and it appears to have been continued to be prescribed by Dr. Lutz.  AR 0384, AR 0410.

48. There is no evidence that Dr. Berman or Dr. Reddy have any experience in treating HIV/AIDS.   There is no evidence that Dr. Berman or Dr. Reddy are psychiatrists.

49. Beckstrand's medications changed from the time benefits were initially awarded and the time benefits were discontinued.  Beckstrand has complained repeatedly from 1998 through 2004 about the side effects of his medication, including gastrointestinal problems, fatigue, and confusion.

50. The Social Security Administration determined that Beckstrand was totally disabled. The Plan benefitted from this finding because it lowered the benefits it was required to pay Beckstrand.

## CONCLUSIONS OF LAW.

1. ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary.  See 29 U.S.C. § 1132(a)(1)(B).
2. ERISA creates federal court jurisdiction to hear such a claim.  See 29 U.S.C. § 1132(e).
3. A court reviews an ERISA challenge to the denial of benefits under an abuse of discretion standard if "the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Here, the Plan has given the administrator such authority, and this court's review is abuse of discretion.

4.  Under abuse of discretion review, the court should affirm the decision to terminate benefits if the decision was "based upon a reasonable interpretation of the plan's terms and made in good faith." Bendixen v. Standard Life Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999). However, an "abuse of discretion analysis allows a court to tailor its review to all the circumstances before it." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 968 (9th Cir. 2006).

5.  The Supreme Court held that when the same entity determines eligibility for benefits and pays those benefits out of its own pocket, a conflict of interest is created and a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits. Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2346 (2008). When the employer has a conflict of interest, the court must take into account the nature of the conflict when it reviews the discretionary acts of a trustee of a common-law trust. Glenn, 128 S.Ct. at 2348. Here, the Plan both determines eligibility and pays benefits, and as such, a conflict of interest exists.

6.  There is no enunciated precise standard for the court's review, and the Supreme Court has warned against creating formulas that will falsify the actual process of judging or serve as instruments of futile casuistry. Glenn, 128 S.Ct. at 2346. The Supreme Court has explained:

> Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payer conflict. In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account. Benefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts-which themselves vary in kind and in degree of seriousness-for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review. Indeed,

> special procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress.
> We believe that Firestone means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. This kind of review is no stranger to the judicial system. Not only trust law, but also administrative law, can ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together.
> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Glenn, 128 S.Ct. at 2351 (internal cites omitted)

7. A conflict of interest must be weighed as a factor in abuse of discretion review on a case-by-case basis, informed by the nature, extent, and effect of the conflict on the decision-making process. The district court, in its discretion, can consider extrinsic evidence in evaluating the conflict's effects. Abatie v. Alta Health & Life Insurance Co., 458 F.3d 955, 970 (9th Cir.2006) (en banc). For example, if there is evidence that a plan administrator "has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record," then the court could "weigh a conflict more heavily[.]" Id. at 968-69.

8. A conflict can be seen if the administrator has a history of biased claims administration. Glenn, 128 S.Ct. at 2351. Here, there is limited evidence concerning any pressure on claims reviewers to deny benefits. The evidence submitted indicates that those who

11

reviewed claims for the Plan were not penalized or rewarded based on the number the claims denied. The court finds no significant evidence of a history of based claims processing because there is no strong "evidence of malice, of self-dealing, or of a parsimonious claims-granting history." Abatie, 458 F.3d at 968.

9. The Supreme Court has clarified that an ERISA fiduciary's structural conflict of interest is *but one factor* in considering whether the fiduciary abused its discretion. Glenn, 128 S.Ct. at 2351.

10. ERISA does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion," nor does it require that plan decision makers "accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003). However, plan administrators may not arbitrarily refuse to credit reliable evidence. Id. at 834. In Glenn, the Supreme Court found that the defendant's emphasize on a certain medical report that favored a denial of benefits and de-emphasize of reports that suggested a contrary conclusion was a serious concern. Glenn, 128 S.Ct. at 2352. Here, there is no indication why the Plan, Dr. Reddy, and Dr. Berman disregarded Dr. Hauptman's opinion. In fact, it does not appear the reviewing doctors even considered this opinion. The failure to even address Dr. Hauptman's report is evidence of arbitrary conduct. The Plan relied on the most recent opinions of its own physicians without even addressing the countervailing opinions of Dr. Lutz and Dr. Hauptman. This factor tends to support a finding of abuse of discretion.

11. ERISA regulations call for a "meaningful dialogue" between the claims administrator and the beneficiary. Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 870 (9th Cir. 2008). A plan administrator is required to give the beneficiary a description of any additional material or information that is necessary for him to perfect the claim, and to do so in a manner calculated to be understood by the claimant. Id. Here, when the Plan denied Beckstrand's benefits in September 8, 2004, the Plan stated that the medical

department had determined that Beckstrand's CD4 and viral load were within normal limits. The denial stated "Mr. Beckstrand, at present, the medical information contained within our file does not continue to support impairment from any less than sedentary occupation." Beckstrand was never told why a normal CD4 and viral load caused him to be disabled in 2001 but not in 2004. Beckstrand was never given any notice that the Plan had concluded his medications were no longer responsible for his symptoms and/or that the Plan had concluded Beckstrand's symptoms were possibly caused by anxiety or depression. There are notes that Beckstrand was called, and when asked if he had ever seen any therapist, psychologist, or psychiatrist for treatment, Beckstrand stated "no." This hardly put Beckstrand on notice that the Plan was no longer following its earlier finding that Beckstrand's medication caused his symptoms or that Beckstrand needed to provide evidence of a mental health diagnosis and treatment. These facts support a finding that the Plan abused it discretion.

12. "When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures." Saffon, 522 F.3d at 871. Such action has the effect of insulating the rationale from review. Id. at 872. "This procedural violation must be weighed by the district court in deciding whether the administrator abused its discretion." Id. Here, the administrative record reveals that Beckstrand was not told that his failure to be treated for a mental condition, a possible reason for Beckstrand's symptoms according to Dr. Berman, was a reason for denial of benefits until the final denial letter. The brief notes in the Administrative Record concerning phone calls hardly put Beckstrand on notice his benefits were being denied because Defendant concluded the best possible explanation for his symptoms were mental health problems. The language in the final denial letter makes clear that the Plan never told Beckstrand the reason for the inquiry into mental health treatment. The letter reads:

| | | |
|---|---|---|
| 1 | | "It is for this reason (i.e. that you **might** be suffering from an impairing psychiatric |
| 2 | | condition) that I asked you if you have been receiving treatment from any psychiatrist or |
| 3 | | therapist for depression."  AR 0045.   If Beckstrand had already been advised about this |
| 4 | | possible explanation for his symptoms, this sentence would be unnecessary.  This fact |
| 5 | | weighs toward a finding of abuse of discretion. |
| 6 | 13. | An ERISA administrator can abuse its discretion if it relies on clearly erroneous findings |
| 7 | | of fact.  Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan, 410 F.3d 1173, 1178 (9th |
| 8 | | Cir. 2005); Taft v. Equitable Life Assur. Soc., 9 F.3d 1469, 1473 (9th Cir.1993).   The |
| 9 | | Supreme Court has generally found that "[a] finding is clearly erroneous when although |
| 10 | | there is evidence to support it, the reviewing body on the entire evidence is left with the |
| 11 | | definite and firm conviction that a mistake has been committed."  Concrete Pipe and |
| 12 | | Products of California, Inc. v. Construction Laborers Pension Trust for Southern |
| 13 | | California, 508 U.S. 602, 622 (1993).   In this case, the Plan denied Beckstrand benefits |
| 14 | | based on Dr. Berman's finding that Beckstrand's symptoms were not caused by his HIV |
| 15 | | or medications and were most likely caused by depression and/or anxiety.  The Plan then |
| 16 | | reasoned that Beckstrand was not being treated for depression and/or anxiety, and |
| 17 | | diagnosis and treatment by a physician for the disabling condition are required by the |
| 18 | | Plan.  As such, the Plan concluded the only possible reason for the symptoms was a |
| 19 | | possible untreated medical condition, and the Plan did not need to provide benefits for |
| 20 | | such a condition.   However, the records reveal that Beckstrand's primary doctors had |
| 21 | | prescribed him with Celexa for depression, and as such, it appears Beckstrand was being |
| 22 | | given some, albeit minimal, treatment for depression.  The Plan's failure to consider |
| 23 | | Beckstrand's possible mental health care by his treating physicians is a factor that tilts |
| 24 | | toward a finding of abuse of discretion. |
| 25 | 14. | In Glenn the Supreme Court found it questionable that the defendant had encouraged the |
| 26 | | plaintiff to request Social Security benefits, the defendant received the bulk of the |

14

benefits, and then ignored the agency's finding.  Glenn, 128 S.Ct. at 2352.  The Supreme Court found this event was an important factor because it suggested procedural unreasonableness.  Id.  In addition, this action gave weight to a conflict because of the defendant's "seemingly inconsistent positions" that were "financially advantageous." Id. In this case, the Plan also benefitted from the Social Security Administration's finding that Beckstrand was entitled to benefits.  The Plan attempts to distinguish Glenn on the ground that when Beckstrand was found disabled by the Social Security Administration the Plan agreed with the disability finding and, unlike the Plan, the Social Security Administration has never re-evaluated Beckstrand.  The court's reading of Glenn does not reveal a fact pattern greatly different than what occurred here.  In Glenn, the defendant concluded the plaintiff met the plan's initial standard, the plan then obtained the benefit of the Social Security Administration's disability finding, including an award of back re-payment, and then the plan found the plaintiff did not meet the plan's "stricter, Social-Security-type standard." Id. at 2346-47.  Here, the Plan similarly benefitted from the Social Security Administration's finding of a disability.  In addition, the Plan failed to address the Social Security Administration's finding that Beckstrand was totally disabled when finding Beckstrand not disabled under a similar standard.  This is yet another factor that tilts toward a finding of an abuse of discretion.

15. A Plan's reliance on a file review does not, standing alone, require the conclusion that the plan administrator acted improperly.  Calvert v. Firstar, 409 F.3d 286, 294 (6th Cir. 2005); Peterson v. Federal Express Corp. Long Term Disability Plan, 2007 WL 1624644, *24 (D.Ariz. 2007).  However, "the failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." Calvert, 409 F.3d at 295. Additionally, when the review contains conclusions that involve "critical credibility determinations regarding a claimant's medical history and symptomology,

15

reliance on such a review may be inadequate." Id. at 297 n. 6. Beckstrand's benefits were denied based on a file review by Dr. Berman. While the Plan had Dr. Reddy conduct an independent medical evaluation, Dr. Reddy did not conclude Beckstrand was not entitled to benefits. Dr. Reddy merely concluded that Beckstrand should be seen by a psychiatrist, and found that from an HIV perspective his viral load was undetectable and he appeared to be on a fairly good regimen. AR 0419. Given the conflicting opinions regarding the reason for Beckstrand's symptoms, the court finds that the failure to do additional examinations raises questions about the thoroughness and accuracy of the Plan's benefits determination.

16. The court is mindful that the abuse of discretion standard is a high standard. It is not an exacting form of review. The court simply cannot "rubber-stamp" Defendant's decision if it failed to provide a full and fair review of the facts of this case. For all the foregoing reasons, the long-term disability benefits must be reinstated. Any future determination on benefits shall provide for a full and fair review consistent with this opinion.

**ORDER**

1. The court GRANTS Beckstrand's claim for reinstatement of long-term disability benefits and they are HEREBY reinstated, retroactive to the date upon which they were terminated;

2. The parties SHALL meet and confer and submit a proposed amended judgment that contains the amount owed to Beckstrand within 30 days of this order's date of service; and

3. An further motions by Beckstrand must be filed by separate motion within 30 days of the entry of this order.

IT IS SO ORDERED.

Dated:   September 16, 2008                   /s/ Anthony W. Ishii
                                        CHIEF UNITED STATES DISTRICT JUDGE